Good morning, Your Honors. My name is Jason Mann and I represent the Secretaries past and present of Public Welfare in this matter. I'd like to reserve three minutes for rebuttal. The primary issue before the Court and the one in which an interlocutory appeal was granted was whether state Medicaid agencies can place liens on the medical portion of personal injury awards obtained by Medicaid recipients. Pennsylvania is one of approximately 30 states that uses such liens to enforce Medicaid third party liability requirements. The District Court below held that such liens are contrary to law and invalid. I want to emphasize at the outset that we're dealing here with liens that secure only the portion of the personal injury award that is assigned to the state as mandated by federal law. We do not lien pain and suffering. We do not lien wage loss. We do not lien loss of consortium. The only thing we lien is the medical portion that is assigned to the state. Since this- Could I interrupt to inquire whether this case should really be before this Court at all at this stage? Your clients won below, did they not? No. Judge Conte's order was very unusual. The judge entered summary judgment in favor of the Commonwealth and denied summary judgment against the plaintiffs, but she wrote an opinion which invalidated the state law. This was a very confusing situation to say the least. As I was trying to explain to personal injury lawyers throughout the state, the judges speak through orders, not opinions, and I wasn't getting very far. Judge Conte was of the opinion- It was not a declaration by the judge that defendants were entitled to qualified immunity? On the monetary damages, she didn't issue a declaration at all. She just issued an order granting and denying. But let me ask- I thought that was going to be your answer, that you won on monetary damages, but you lost on declaratory and injunctive. Well, again, this was the procedural conundrum that we're in, and eventually the parties went to Judge Conte with an agreed stipulated order. The order essentially corrected her order to deny the department summary judgment on- or the secretary, excuse me- summary judgment on the validity of the lien so that it was an adverse order. I mean, because she did- her opinion did, in fact, deny a summary judgment on the lien issue. She just didn't have that in the March 25th order. And Judge Conte, at the same time, certified the matter for an interlocutory appeal, which this court granted because of the importance of the issue. Did that answer your question, Judge? I have an impertinent question, but I probably ought to direct it to my colleagues, whether this court's granting a certificate of appeal, permitting an interlocutory order to be reviewed, whether that's a jurisdictional conclusion that we're bound by. Well, that's a question I would have asked, and I didn't ask it. Can I jump in? Please, Judge. I mean, I got 11,000 cases in the Courts of Common Pleas of the Commonwealth. This case has created extraordinary confusion among the bar, among the local trial judges, among everyone that's involved with adjudicating medical assistance liens. We have a million- over a million Medicaid recipients in Pennsylvania. And we need to get this issue resolved. Judge Conte recognized that when she certified the matter for an interlocutory appeal. That's why A.H. was added to the case, because there was a bona fide standing problem. It was a bona fide standing problem, and the parties entered into agreement that would resolve Judge Conte's concern by adding A.H. We put stipulated facts into the record regarding A.H. I think those stipulated facts are certainly sufficient to resolve the lien issue and also the capitation fee issue, which I'll get to further on. And Judge Conte agreed to certify. She recognized that this was a groundbreaking opinion, that it had nationwide implications. I speak nationally to public welfare attorneys, and we've been doing a seminar on this case every year. It's a very problematic case, and it's beginning to spill outside of Pennsylvania as people read it and try to test Judge Conte's opinion. So you're looking- is it fair to say you're looking foremost from us for some clarity? Absolutely, Judge. Guidance and clarity. Absolutely. Absolutely, Judge. Mr. Manning, I agree with you. It's an unusual opinion. In her conclusion, when she says the plain language of 1396 PA1 and et cetera precludes the liens and recoveries challenged in this case, and then the application of the other statute was unconstitutional, et cetera, it looks like a declaratory judgment. Did somebody ask for a declaratory- was that one of the things- Plaintiffs asked for a declaratory judgment. Plaintiffs did. Yes, part of the complaint. One might, in answer to the inquiry that Judge Pollack raised, say that this is the grant, at least in part, of the declaratory judgment, and therefore the plaintiff has the right to hear it. Well, yes. I will jump at that, Judge. I wanted to get to the opinion. I will jump at that. Okay. But I'll- Well, I didn't remember that they had asked for a declaratory judgment. I could check the- you can check the record, but I'm pretty sure Patrick did. You know, there'd be nods. Mm-hmm. Yeah. Okay. I saw- I was saying that we are dealing with liens on the assigned portion of the personal injury, the medical portion only. And since the Supreme Court's Alborn decision, it has been clear that a lien imposed by a state, if you can have liens, has to be limited to the assigned portions only. And we've been complying with that. And in 2008, the Pennsylvania legislature enacted a statute codifying Alborn, as have a number of other states, including, for example, California. As Your Honor just noted, the federal law issues in which the district court relied are the anti-lien and anti-recovery provisions, primarily anti-lien provision. And Alborn was a curious case because- Could you talk a little slower? Yes. Because you are on the disk. And I don't know about anybody else, but I listen to the oral argument just before I begin to write an opinion. Yes, Your Honor. I'm not saying I'm writing this. Or begin to agree with somebody else's opinion. In Alborn, this was an unusual situation because the Supreme Court assumed what we're here arguing about today. The Supreme Court assumed that states can implement the Medicaid third-party liability obligations by taking liens and then concluded that to the extent, and I'm quoting here, to the extent the forced assignment is authorized by 1396A25 and K.A., it is an exception to the anti-lien provision. So the anti-lien provision standing alone does not cause a problem for state Medicaid lien laws. What causes a problem for state Medicaid lien laws is other provisions of the statute which Judge Conte read to require states to take independent legal action and not to glum on to, so to speak, the plaintiff's action and say, me too. And I would also add, although the anti-recovery clause doesn't get much attention because it's the same rationale applies. If states are authorized to take liens as part of the third-party liability, it's the same thing. It would have to be an implied exception to the anti-recovery law. Now, the state Medicaid statute says nothing about states having to bring independent lawsuits. What Judge Conte seized upon was the language in the state Medicaid statute that talks about, I call it the pursuit and assist language. The requirement that states gather information to pursue third parties, the requirement in the assignment statute that recipients cooperate in assisting the state. What I think the district court made a mistake is that timing is everything with respect to this statute. And Congress was extraordinarily explicit in saying when the pursuit occurs and when the state has to take action to seek reimbursement. And that obligation arises when legal liability is found. Now, Judge Conte's opinion says, well, the state can bring its own lawsuits or the state can intervene. And that's true. But neither of those actions can occur or should occur after a finding of liability by, after liability has been found. Normally, you bring a lawsuit before liability has been found to exist. So when we talk about the state pursuing third parties, all right, that pursuit, and you talk about also that the Congress was explicit as to timing when liability is found to exist, the only thing that you can do, you're only left with two conclusions, A, that Congress intended duplicate lawsuits, that after a plaintiff settled his or her lawsuit, that the state would swoop in with a second lawsuit. Sotomayor, why couldn't you just intervene before liability is adjudicated? Because that would run afoul of the congressional mandate. We can't, but must we? I mean, we're dealing with not what we can do, but what we must do. And the statute says that we must pursue. Let's just for a minute, tell me why as a practical matter, because I think you've done a good job of explaining why the practicalities of this, you know, the 11,000 lawsuits, etc., and what you wrote in your brief. The practicalities are important here. What is it about intervention into the pending lawsuit that's so It's expensive. It's expensive. Why is it more expensive than, I mean, you've sent letters to these folks. You've sent demand letters. I mean, instead of the person drafting the demand letter, just intervene and then wait. Judges, lawyers aren't cheap, Judge. I mean, I got civil service who are paying $30,000, $40,000 a year writing these letters with a computer that pumps them out. You can't do that with a. You can't have paralegals prepare the intervention papers and then. You know, the common pleas courts are walk-in courts in the Commonwealth. You've got mail-in courts like the federal courts. You've got to send somebody out there. They have to travel to the local county seat. They've got to sit there in motions court. They've got to present that. That costs money. And I think plaintiffs acknowledge in their brief, when I pointed that out, that they said, well, maybe Congress didn't intend that these small claims not be pursued, and I don't think that's a viable argument. That's a lot. A lot of our money is small claims. I want to talk a little bit about partial assignments, because this whole notion of partial assignments is not something that the Supreme Court seemed to have picked up in Alborn, or that the Martin Court picked up in Minnesota, or that Judge Dunham, I think of his name, is in Utah. And partial assignments is sort of an obscure area of the law. I didn't even know about it until I researched this case. And there is a different rule for partial assignments than there is for complete assignments. And that rule is set forth in the Mandeville case. Pennsylvania adopted that rule in the Gordon case, which is cited in my brief in 1935. And that general rule is that for partial assignments, the assinore retains the right to sue subject to the assignment. Now, the earlier cases did not give the assinee a lien. The later cases do. Equity eventually stepped in as we moved from the 1800s into the 1900s. And I think it's now fairly universal that... You keep on talking, then we'll stop. Okay. Just because we want to hear you. Okay. I think it's fairly universal now that there is a remedy, whether you call it a lien or a lien-like situation, that to give the assinee some redress. Certainly in Pennsylvania, I pointed to the legal capital case, which is a very recent case which involved a partial assignment where the Pennsylvania Supreme Court recognized the rights of the assinee. I pointed to a more recent United States Supreme Court, the Dolman versus Levine case, where the United States Supreme Court recognized that partial assinees have to have some rights. And I think the modern rule is that the partial assinee does have a lien or a lien-like obligation. And I would point out that even in the Martin case, where the Minnesota Supreme Court adopted essentially the rationale of the district court and said the states have to sue, at the end of the day, when the plaintiff had the state's money, the Minnesota Supreme Court said, give it up. And that's the most troubling part of the district court's decision, this notion that if the state doesn't intervene and they get our money, that they can keep our money. And by our money, remember we're dealing here with a majority of federal dollars. I mean, every dollar that's paid out in Medicaid is at least, in Pennsylvania, it's at 56%. With the stimulus, I think it's closer to 80% federal dollars. So what the district court is saying is that Congress said, well, if the state doesn't intervene, the federal government's going to, Treasury's going to be punished by allowing the plaintiff to keep the federal government's money. And I have also pointed out that apart from the Medicaid statute, you have the health care fraud statute, 18 U.S.C. 666, which says you can't convert federal dollars. So even if this court would agree with the Martin court and say you have to sue, you cannot let the plaintiffs keep the state and federal money. They have to disgorge it. Ultimately, they have ended up with money to which they're not entitled. Mr. Manning, please tell us about the capitation issue. The capitation issue. The capitation issue. There are two capitation issues in the case. I'm going to briefly cover the state law capitation issue, and then the more difficult issue is the federal law capitation issue. The state law capitation issue resulted in a, resulted from a unpublished Pennsylvania Superior Court decision, which the legislature swiftly overruled. Because it was a non-precedential opinion, it was, we did not consider it binding, and we did not follow it. And of course, as I said, it was swiftly overruled. The district court, in deciding an argument on collateral estoppel and res judicata, said, well, I don't have to decide collateral estoppel and res judicata because I agree with the Superior Court's unpublished decision. State's response here is, the Secretary's response here is, A, if neither of the plaintiffs before you had standing to pursue the issue, why did you even have to reach it? I understood from the organization of her opinion that the court, that was a logical step in the way the court organized its very lengthy opinion. But the court could have simply just deleted that section and said, I don't have to reach capitation fees, nobody has standing. Then the second issue, which is I've raised, is this Penhurst issue, which is that the plaintiffs are essentially asking a federal court to tell state officials that they violated state law, and we suggest that that is prohibited. Now, the federal law capitation issue was not addressed by the district court. The parties have agreed that the court can decide it. The parties have briefed the issue. The federal law capitation issue is essentially very, very similar in my mind to the lien issue, because you have on its face one provision that seems to say one thing, but there are other provisions that seem to say the other. So just as the anti-lien provision on its face would say no liens, and the Supreme Court said in Alborn, to the extent authorized by other sections of the Social Security Act, Medicaid liens are an exception to the anti-lien provision. I would say that you have the same situation here. I mean, what you have here are two statutes, both of which predated managed care and Medicaid, and plaintiffs acknowledged that in their brief. One statute says that what the state will retain from the collection is an amount to reimburse it. Reimburse it. Those are the key words that they rely upon. That which it put out, in other words. That's right. Which is what the capitation fee is. The other provision of the Medicaid statute, which the plaintiffs don't cite, but what we say is that the state is obligated under A25 to seek reimbursement to the extent of legal liability. And in Pennsylvania, under the Moorhead case, the amount a tortfeasor is legally liable for is the amount of payments that were actually paid out by the provider. Now, there's a very neat way of resolving this, because... Wait, wait, wait. That was fast. The amount that was paid out by the provider. But did the managed care organization pay out... Who paid out under that provision? All right, we paid the managed care organization. The capitation fee. Let me use an example. In Pittsburgh, we have Gateway Health Plan. That's our Medicaid MCO. One of our Medicaid MCOs. We pay Gateway Health Plan a per member per month fee. Gateway Health Plan then pays the medical bills, presumably for AH, I think that was her plan. It might have been another plan. For AH, okay? They paid her hospital bills, they paid her doctor bills, they paid medical tests, they paid out. Now, when AH brought suit, she brought suit for her medical expenses, and the amount of the medical expenses she included in her lawsuit were the amount, on the moorhead, is the amount... I don't know what they actually were, but on the moorhead, they would be the amounts that the providers received from Gateway. Now, the wrinkle on this is that when we negotiated our contracts with the MCOs, we said, okay, MCO, you have subrogation rights. You're an insurance company. You have common law and contractual subrogation rights under Pennsylvania law. We think that we can do a better job of collecting that money than you can. We want to buy them from you. And we did. Our contracts provide that they are not going to do the subrogation responsibility for the Gateway clients. We're going to do it, and we pay them more money. So when they say, oh, there's a windfall because you're collecting more than the capitation fee, remember that we paid Gateway to get its MCO subrogation rights. And under federal law, somebody has to collect up to the limits of liability. That's the mandate of 1396A25. Either we or the MCO have to pursue up to the limits of liability. Now, what plaintiffs say in their brief, essentially to acknowledge that the way that the state could comply with this is the state would collect the capitation fee, and the MCO would pursue its subrogation rights. Now, that may be fine for AH, but for a lot of people, first of all, it means that now instead of just the recipient being liable for what Medicaid paid out through the program, they'd be liable to two payors, one to the MCO as an insurance company, and one to the state for the capitation fee. So we're putting an additional burden on. But the second problem is you end up with a lot of absurd results. For example, the Joshua Valenta case. If we collected the capitation fee, in his case, we would be owed $1,000 when the MCO paid out $42.35, I think it is. And what it comes down to is this notion that back in 1968 and 1973, when these statutes were enacted, when managed care was not even a glimmer in the Medicaid programs in the eyes of Congress, that Congress intended to mandate a business arrangement whereby the MCOs would exercise their subrogation rights and we would retain the capitation fee. And we just don't think that makes any sense. We were instructed by the federal government, given our particular laws and procedures, that the way that made sense was for us to recover the MCO payments. And as I said, we paid for that right. We paid for that right. We were also instructed that, And if we rule against you on that issue, then you'll just have to change those contracts. We'll have to change those. They'll pursue it themselves instead of you pursuing it for them. That's right. And we think they'll do it less efficiently. We'll reduce the payments. I mean, it comes down to... But earlier you were lamenting your 11,000 cases. So why not slough that off on them? Let them undertake that responsibility. Hey, it's money, Judge. It's money. I mean, why not... But don't they want the money just as badly as you do? No, I mean, we have a business arrangement with them and they're happy getting the higher rates and we're happy doing the work because we think we do a better job. I mean, we have a collection process. Why have duplicate, two sets of subrogation agents pursuing... I mean, why have all that extra? We have the manpower in Harrisburg. We have the system set up in Harrisburg. We have the statutory framework set up in Harrisburg. The MCOs are happy to accept a little extra money to give us those subrogation rights. Everybody is happy. I mean, what we're coming down to is this argument that the literal language of the statute requires a specific business arrangement. I think you're right there. It's basically just rearranging the deck chairs on the Titanic. At the end of the day, the recipients are going to pay the same amount or more, but just write two checks to two different parties. I mean, what's the sense of that? What's the sense of that? Right. A lot of this might not make sense, but if the statutory language compels something, I mean, you know, even if you make a compelling argument about the logistics of this, how do you get around 1396's language that no lien may be imposed? Well, I mean, let's not confuse it. Are we talking lien or capitation? Yeah, I know. You were previously talking about capitation, but the practical aspects of all of these issues, to me, are important, regardless of whether we're talking about capitation or the lien. And I mean, how do you get around the lien language that says no lien? Well, the Supreme Court already got around that for me, Judge. The Supreme Court already said in Albarn that they already addressed that argument in Albarn by saying that to the extent the forced assignment is authorized by other provisions of the Social Security Act, and we say it is, that it's an implied exception. They've already rejected the literalist interpretation of the anti-lien provision. That is why Judge Conte in her decision had to focus on AA25, the pursuit language and the assist language, because the Supreme Court had already taken away from her the literal language of the anti-lien provision. The Supreme Court was very clear in Albarn. I mean, I read the sentence at the beginning of my argument. To the extent the forced assignment is authorized by 1396A25 and 1396KA, it is an exception to the anti-lien provision. That's not dicta, Judge. To the extent it's authorized. I thought that's what we were here to decide. Well, that's right. You said we're here to decide the question left open by Albarn, and now you're telling us that Albarn dictates the result in your favor. No, Your Honor. I'm not saying that at all. What I'm saying is that you are foreclosed by Albarn from Albarn from saying, I want to take a literal reading of the anti-lien provision, disregard everything else, and say, state you lose because you're taking a lien. Albarn forecloses that. What Albarn leaves open is for you to examine the pursuit language, the assist language, and the found-to-exist language to determine whether or not Congress left open to the states the option of invoking this exception. In creating a system that would create this exception. Because the anti... I need to slow you down, because you know this stuff a lot better than I do. Are you telling us that although the federal statute says no lien shall be imposed, because Albarn rejects a literalist interpretation, a state law can be passed saying that a lien may be imposed? Well, it cannot be imposed. It can be imposed... I mean, the assignment itself, and this is what we've argued in our brief, the assignment itself, the federally mandated assignment itself, is a lien. It is to quote Shakespeare, a rose by any other name, okay? It's our money. It's a question of how are the states going... Now, if I were to ask everyone in this courtroom, well, not them, but explain to me the ramification of a partial assignment. Does anyone know? Probably not. It's very obscure. If you want to tell people what is the effect of a partial assignment, and you say, oh, a partial assignment is a lien on the assigned portion. Well, everybody knows what that is, so that's what states have done since 1976. The crucial portion here is that all we are doing is effectuating the federally mandated assignment. And remember also, in addition to the anti-lien and anti-recovery provisions, and the pursuit provisions, and the assist provisions, is this 1993 statute, later than everything else, that tells states enact this 1396 A25H, which didn't get a lot of attention in the district court's opinion, although she cited it. A25H, which specifically authorizes states to enact laws to effectuate the assignment. Well, I agree with you on the assignment, but it's a strange interrelationship, it seems, between the assignment statute and the anti-lien statute, because Congress seems to be giving with one hand and taking away with the other, that Congress is imploring you, exhorting you to go out and collect. Right? But via the assignment. And it's giving you that power, but at the same provision, at the same time, they're saying go ahead and collect, but you can't use the most effective tool in your arsenal, namely the lien. Which is why the Supreme Court said what that language I just said. Because, as I said, a rose by any other name. A rose by any other name. When you say there's a partial assignment, you can, you know, we can talk about bundles of sticks and all that kind of stuff with respect to what the difference is. In the end of analysis, a partial assignment and a lien are basically going to be the same thing. That's why you end up with the partial assignment cases saying there's an equitable lien or in Martin that they have to give it back. I mean, whatever you want to call these bundles of sticks, it's a rose by any other name. Okay? But maybe Congress hadn't, Congress wasn't familiar with Shakespeare. And it persisted in this odd phrase of no lien, et cetera. I don't see if you want to take the question, Judge. Isn't that troublesome to say, well, the lien and the assignment. Well, and again, remember, the most troubling thing I found in the Alborn opinion was when the Pennsylvania, when the United States Supreme Court asked, well, why would you need a lien on your own property? And the answer is, well, of course you need a lien on your own property. How else do you tell the third parties that you have an interest in it? I mean, you can tell them I have a partial assignment. They're going to sit there and say, now what do I do? And remember the big difference here is that we're not leaning property of the recipient. We're not recovering property of the recipient. Well, you just put the rabbit in the hat, though. They're going to get up and say that you are leaning their property. Well, this is the big distinction between the Arkansas case and the Pennsylvania case, which I don't believe the district court picked up in. I mean, Arkansas, I mean, the Supreme Court was absolutely befuddled. And of course, in hindsight, it's 2020. And I jag the Arkansas lawyers all the time when I see them. Arkansas insisted, and the Supreme Court uses the words, insists that Alborn retain her entire shows in action, okay? And I took a look at that and said, she doesn't have her entire shows in action. She has bare legal title. That's it. She can bring a lawsuit, she can recover the money, and she can give it to us. Can she settle the case without Alcorn's consent? No. Can we displace her if we choose to? Yes. Do we have a right at the settlement table? Schaefer Doan, Commonwealth Court opinion from last year, says, yes, we do. If they settle it without us and they don't get our permission, can we vacate the settlement and intervene? The Grady Jordan case, also from last year, and a bunch of other Commonwealth court tests say, yes. You've just persuasively made their case. You've just told us about the several remedies that you have apart from a lien. So why is the lien so critical other than its ease of employment? Well, again, I'll come back to it. I rose by any other name. I mean, when you say you have a lien, what does it mean? It means that if you deal improperly with that money, the state can get it back. And if a third party takes the signed monies and gives it to the plaintiff, can we go after the third party? You bet you we can. That's a lien. Even if your argument is thoroughly persuasive, the upshot of it is for us to read the anti-lien provision out of federal law. I mean, what you've essentially done is critiqued the illogic of these two statutes. Oh, absolutely not, Judge. Absolutely not. The anti-lien provision prevents us from liening property of the recipient. That's the square holding of Alborn. The anti-lien and anti-recovery provisions- All right, now tell us why this is not property of these recipients. Because it's assigned to us by federal law. To the extent the partial, I mean, we have an unallocated fund. That's what- I can't assign property. I mean, people who have property make assignments all the time. And then it's mine, then it's mine. When a tenant assigns a lease to a subtenant, that tenant has no property right in the lease, they still retain a property right. They've given away part of their property to the assignee, but they still retain property right. But the part they've given away is gone. The part they've given away is gone. Right, but this statute doesn't break it down and say the anti-lien provision applies to a portion of your property, but not to another portion. Well, the anti-lien provision, I think, can sensibly be read. I mean, I don't think, I would be nice if we probably wouldn't have this case if the anti-lien provision says no lien shall be placed against property of a recipient. I mean, I have to pull here and pull exactly what the lien, anti-lien, I have it in front of me, so why don't I just get it? Property of any individual. No lien of property of any individual prior to his death. And the question is whether or not the money that's been assigned to us, the partial assignment, is property of the individual. And we have asserted, contrary to what Arkansas said in Alborn, Arkansas wanted to say she still had property. We're saying she has no cognizable property in the assigned proceeds under federal law. She has bare legal title, and bare legal title is not property under most federal statutes. It's not federal. But when a personal injury plaintiff settles a case for $100,000, that $100,000 is their property. Now that property may be encumbered by various assignments or other obligations, but it's still that person's property. Not if, no it isn't, no it isn't. We're not talking, remember, we're not talking about an encumbrance, we're talking about a partial assignment, a partial assignment. And we have to effectuate the intent of Congress here. Congress said that the medical portion of that cause of action belongs to us. Now we're allowing her. It belongs to you because they have to assign their rights in it to you. By operation, it's by federal mandate, 1396-K. That portion, now, if you have $100,000. And they should have to pay that to you under federal law without you even getting out of your chair, right? They have an independent affirmative obligation to pay that over to you. Well, under 18 U.S. 666, they would be guilty of a felony if they didn't, yes. But let me get this point out because it's fairly important, okay? This property interest notion, okay? The, what I have been saying is that they have a right, as consistent with the common law of partial assignments, to obtain bare legal title to the partial assigned amounts, to the medical expenses that are otherwise owned by the state. Beyond, bare legal title under federal law, under bankruptcy law, under mechanics liens, under the, what is it called? Forfeiture statute. Bare legal title, when federal courts have said, okay, when you have bare legal title, a trustee, for example, a trustee does not have, bare legal title does not constitute a cognizable part of property interest. And what we have said, and what you just said, I made their case, but I didn't think I did, is that bare legal title is not property of the individual. And that's all they have with respect to the assigned medical expenses, is the right to obtain bare legal property. We can take it back if we want to, and if they don't deal with it, if they don't invite us to the settlement conference, we can set it aside. They have very few rights with respect to that assigned money. And that does not constitute property of the individual. That's the distinction between our case and Alborn. Is Arkansas was insisting that she retained her chosen action, and Pennsylvania's saying, uh-uh, uh-uh, uh-uh. They have bare legal title with respect to the assigned amounts only. Okay, do you have any questions? No. Do you have any more questions? Thank you very much. We will hear from Mr. Loughran, am I pronouncing it correctly? Loughran, Your Honor, yes. Loughran, okay. I may have pleased the court. I'd like to address some of the arguments that we just covered. I hope so. That's what you're getting up for. I won't talk as quickly, because I don't have quite as much to say. Oh. Because I believe that. You mean because he's right most of the time? Actually, no, Your Honor. When words of a statute are crystal clear, I don't think we have to get too far. Well, that's what your brief says, you know, and you keep stressing that. But how do you answer all the arguments that if you put it all together, together with what the Supreme Court said, that they do have an interest that they can put a lien on. A lien is an exception to the anti-lien, to the bare, to the language. I mean, you agree that the state has a right to get this money from a third party, right? I agree that the state has a statutory obligation to independently pursue the third party. Okay, so is this a technicality that we're talking about? I mean, if they have the right to get it, why should we say, why did the district court say, well, they have to file a separate suit to get it? Or intervene. What policy does that effectuate to make them go through that step? Well, that answer is there could be a lot of things, and I'll give you some examples which I think would be helpful. The presumption here is that Congress wanted indigent victims of torts to pursue liable third parties. When Congress said to the states, do you want to take all this money and use it for your welfare program? Congress told the states, we want to entrust in you to go after them. So if we follow what the state wants, if the indigents don't hire lawyers and sue, Pennsylvania isn't doing its job that Congress mandated it to do. So a good policy argument would be to comply with the federal law, Pennsylvania has to make the determinations to sue, Pennsylvania has to go and sue, and that will assure Congress and the federal government that Pennsylvania's doing what it was mandated to do. It can't. This is the, go ahead. You're saying Pennsylvania should sue in the first instance on behalf of the injured parties? Pennsylvania should sue for its assigned chosen action, which is the medical benefit. It's claimed. But why? That seems like, I mean, very troubled by the notion here that this is a cat and mouse game. No, sir, your honor. That if the state has to take on the responsibility of intervening in 67 counties, and many of which require hand filing, that a tremendous amount of money to which the state is entitled under federal law by virtue of your client's assignment obligations will be lost. And you want them to have to intervene because you know full well that they're not going to be able to do it in a lot of cases. So if you get a settlement for 100,000 and 2,800 of it should go back to the state, every time they are unable to collect that 2,800, it's going to stay in the pockets of your client and perhaps in counsel's pocket as well. If the state intervenes in the suit, it's a party plaintiff along with me. So I'm not going to be pursuing the state's medical bill claim. The state will be there. No, I'm positing that it's not feasible for them to intervene in all the cases. I mean, the reason, I guess what I'm suggesting is explain to me why my understanding of where we are now is as follows. You don't want them to lean it because they're going to collect it in a very facile way and you have a pretty good argument that there's a federal statute that says they can't lean it. But if they can't lean it, they have to intervene. And if they intervene, the state's going to lose a tremendous amount of money, perhaps in bits and pieces of 400 here and 1,100 there that it otherwise would be entitled to. What am I missing? I don't necessarily agree with that because when the state would intervene, which they're doing across the Commonwealth right now, Mr. Laffey's sitting here, it's going on and you can count on your hand almost the number of claim representatives that they've had historically to write these letters asserting leans. It's not burdensome and there's no record of that. But when the state would come in to intervene as they're doing, negotiations occur that never exist whenever they're just directing us, pay what we want or you go to jail. It helps facilitate settlement. The business of litigation, when you have someone at the table who if I were to settle my malpractice case with a torch freezer and turn to the state and say, do you have $150,000 to try this case tomorrow? No, well then let's start being reasonable together and work collectively. This will move cases, okay? So you need them at the table because of the way settlement negotiations work. And it's, yes, to directly answer that and... I don't understand. Why do you need them at the table? Are you challenging the statute, both federal and state, that say that we can view that as an assignment, as a matter of law? I mean, you agree that it's the state's money, right? Until we get the capitation, when we get the how much. Right. Yeah, but before we get the capitation. The state, when you sign up for welfare, you assign your right to the state to pursue torch freezers to the extent you had a case against it for medical. You retain, that was paid by the state. You retain your wages, your pain and suffering, disfigurement, et cetera. We're only talking about the medical. The expenses for the medical services. And so once by legal assignment, I had it and now I don't. And it's the state's chosen action. And Congress said, my property, there shall be no lien and there shall be no recovery. All right, they say it's not your property. They say that small portion that's carved out for medical is not your property. Why are they wrong? The federal statute says that I assigned that to them. So if it wasn't mine to begin with, I couldn't assign it. Oh, I think they'd admit that it was yours to begin with, but after the assignment, it's now theirs. And that's their chosen action to go pursue the torch freezers with. And that's exactly what Congress told them to do. I'm to cooperate with them in pursuing liable third parties. But why would Congress want to force them to do it the hard way, if there's a more cost effective way to collect? Those are legislative determinations, Your Honor, that Congress obviously decided and thought about and they came up with this statute. Can you point to anything in the legislative history or any language that says that Congress thought about it and came up with this, with your result? Not in the legislative, in the debates or anything. How can you say Congress thought about it and decided that this is the way Congress wanted to do it, when it's the inefficient way, it's costly way, and it won't end up possibly, probably, with the state getting back all that it put out? I'm not so sure that that's correct, Your Honor. What part of what I said is not correct? When the state makes claims against tortfeasors, they may well pay those claims to take away our medical bills that would otherwise be put up in personal injury cases, which often drives the verdict higher. So it may be in the tortfeasor's interest to take care of the state's claim and then litigate against the plaintiff and his lawyer. There are so many considerations that, for that reason, I think we look, Judge Pollack brought up, Shakespeare, where they're trying to argue that when Congress uses a lien, that a lien means something other than a lien. Congress uses the word assignment, and Congress uses the word lien in the statute we're talking about. They knew what they're talking about there. And if there were the bare legal title exception to the anti-lien provision, it has exceptions underneath it. Congress could have easily have written, there shall be no lien on the property of an individual during his lifetime except whenever he's injured by a tortfeasor and pursues a third party and makes a recovery. If you prevail in this case, could the Commonwealth turn around and pass a statute that says that Medicare beneficiaries have no property interest in their assigned medical claims? Could the state pass a statute that says that Medicaid beneficiaries have no interest in... No property right. In the medical... Wouldn't that be a way for the state to get around the anti-lien prohibition because it presupposes that you have a property right in something that you can't lien. If you don't have a property right in it, then they could... And you see, here's the thing, Your Honor. I think the federal law already says, when you sign up for Medicaid, you've assigned your right to pursue third parties. You've assigned any cause of action that would subsequently arise for a suit against someone that caused the state to incur these costs. That is owned by the state now, and they must pursue it. So when we sue, and this is very different than what has happened over the past 40 years, but it's the way the statute is written. The state has the cause of action for the medical bills, and the state has the statutory obligation to pursue it. What the indigent is left with is the other claims that arise out of the tortious conduct. What the state has been doing is coming in, abdicating its obligation to pursue liable third parties, putting the onus of that obligation onto indigent people and their lawyers, putting 100% of the costs of that onto indigent people and their lawyers, who when we were to lose a case and have 100,000 in costs that we lose the trial, does the state have to pay any of that money back? I don't understand that that's what the state is doing. I thought they always say, this is after the lawyer's fees. But what about when we lose, Your Honor? They're making you do all the legwork. They are taking their federal? And you guys are incentivized because you're stakeholders as well. The typical case, you're on a contingency fee, which there's nothing wrong with that, but you have the ultimate incentive to pursue these cases aggressively, and then they want to walk in with little or no effort and get reimbursed for their medical. With zero effort, Your Honor. But it's their money. I mean, you agree that it's their money, that they have, I mean, everything we're talking about is money that the state paid for the Medicaid to be, medical services to be given to the indigent, right? I mean, this is, I mean, they're not just walking in and saying, hey, we want to, I mean, this is not taxes. It's April 15th, and we've paid enough money to the government. Your Honor. This is state money, and the question is, is there an efficient, effective way for the state to get it back when a third party has paid, is liable? And I guess most of the liability that I can think of is in tort actions. Does it come up? How else does this third party liability come up other than in tort actions? They may pursue insurance companies. I'll let Mr. Mann. Well, but insurance companies is another way of saying a tort action. No, no, like Highmark, Blue Cross, Blue Shield for a bill that the state paid, and there was actually coverage, and there's no tort. It's just a doctor billed the state thinking the person was on welfare. But there's a lot of... Do you have examples of instances where where monies were spent on behalf of the Medicaid, Medicare recipient, and Medicaid. Right, thank you. Medicaid recipient, and it might have been a lot of money, and the state did not pursue it because someone like yourself was not doing the work for them? Well, the state... It's a cumbersome way of asking. Is the state losing money that it should be recouping, but it's not taking the initiative to recoup? It could be. Right, now you see, Congress told the states that when you evaluate these situations, if it's cost-effective to do so, then you pursue it. Congress told the states, if you determine it's not cost-effective to go pursue the liable third party yourself, you don't have to do it, and you can still participate in the Medicaid program. What Pennsylvania... Congress, by 1396K, which says, it says to the state, you shall collect what is necessary to reimburse you, give the remainder to the feds, and then give the rest to the person. That statute, he was saying earlier, arguing that it's a timing when legal liability is determined and all that. 1396KB contemplates specifically that the state is evaluating whether to sue someone, the state is suing that person, the state is taking that which is necessary to reimburse it, the state is giving the remainder to the federal government, and what's left over to the indigent. The argument that legal liability doesn't attach until we sue and then get a judgment against the tortfeasors, and that's when the state must act, is refuted by the plain language of the statute, which says the state shall pursue, and by the way that the state's been ordered to disperse the money that it gets when it sues. The states have simply just not done what Congress told them to do. Let me switch you to the capitation issue. Thank you, Your Honor. Are you happy with the way the district court decided that or not? Well, I'd like to make sure your understanding of the way the district court. All right, tell us. Tell us what it is that you think we should understand. I believe that under federal law, 1396KB, the state can only get back that which is necessary to reimburse it, and it here is the state. The definition of reimburse, you get back what you paid. In Pennsylvania, only pays a capitated payment or a premium, and they are, you know, the AH is an added plaintiff here. The state admits it paid $26,000, and it wants to take $104,000 from this girl. On what theory? On what theory? Do they want to take it? Yeah, on the theory that it was reimbursed. It's something the third party paid or is liable to pay, right? Well, yeah. The state's claiming that some insurance company paid that much money. And who should keep that money? Well, in reality, the state takes the money, takes the 104,000, and does not kick any of it back to the carrier. And the district court held which way? Well, the district court didn't enter a ruling on the federal. The district court did discuss. Pennsylvania had its state welfare code section 14. It's amazing I'm drawing back. 14 has, it's B7-1 that said, the state shall get back the expenditures that the state paid. And that was construed to mean what the state is actually paying. They got caught in the case of In Re CS by taking what the insurance companies are paying. And the superior court said, that's a windfall to you, Pennsylvania. Your state statute says you get back what you pay. They amended the state statute to say, plus we get back whatever the MCOs have paid. And Judge Conte said that between, well, prior to that time, the taking of more than the capitated payment would be a violation. She did not have the occasion to get to whether it violates the federal law because she found that the two plaintiffs we had in at the case, at the time in the case, Valentin Tristani weren't capitated. Well, one was a fee for service and the other one, the math didn't work. But so we added AH in. In AH, the math works. The state is clearly taking multiple times what it has paid. And what did Congress contemplate? When they wrote the law, there wasn't capitated premiums. It was fee for service. The doctor bills, the state pays. So whatever the state was getting back is what the state paid. That's what Congress contemplated. Now, these insurance programs are created through society and states determine they can have a lot of savings. And so they're paying far less than they would if it were fee for service. And yet when we go win the case on behalf of people, they come in and basically lie and say we've paid a hundred some thousand dollars when they've really only raised the premium, or paid a premium. Why would it, you know, our clients are proud to pay back the debt that they incurred to get these benefits. And if it costs the state $26,000 to provide health coverage to our clients, then the federal law says we owe back, we reimburse $26,000. We don't reimburse a hundred and, you know, some thousand dollars. In the record is the deposition of the designee of the state. They've admitted that sometimes they'll take 10 times what they've paid. Sometimes they take less. How can that possibly be consistent with the federal statute? Which says you can only take back that which is necessary to reimburse you. Do we have jurisdiction over that issue? Yeah. I mean, you didn't file it timely. Well, I think Mr. Your cross appeal, right? Yeah. That's right. I'm gonna defer to Mr. Mann to, he raised that issue. And he may. He wants it decided too. Yes. He's gonna come to your rescue because you both want it decided. But we have to decide our, we have the responsibility of deciding our own jurisdiction. You might, I mean, lots of times people would like us to decide something and we'd say, sorry, we just can't do it. So didn't you have to file a notice of appeal? Well, I believe that the answer is yes. But I believe we've cited in the brief that, no, we did file a notice of appeal, but I think we didn't get permission for an interlocutory appeal. You didn't file a petition for permission to appeal. That's what you didn't do. And Your Honor, I think that the issue of the capitated fee is fairly raised within the issues that are raised by the Commonwealth's argument. Well, that's if we have jurisdiction over the Commonwealth's appeal, the question that Judge Pollack raised with respect to whether it's an adverse judgment or not, then I think probably we could say that capitation issue falls within that. But it would have been safer to file your own petition for permission to appeal. I think. I may agree with you, Your Honor. Do you have any questions?  Okay, thank you very much. Thank you, Your Honor. Well, now let Mr. Matty answer the question that you say Mr. Matty should answer. And I'm not going to answer it because he should have filed a cross petition and I'm annoyed that he didn't. Well, you're not going to do that. No. You're not going to. I do want to address this because Mr. Lockman said it several times, this notion that we're somehow getting a windfall. Remember that. Well, address the jurisdictional thing first. Well, to be honest with you, Judge, there's some cases from other circuits that say that a cross appeal should be filed, a cross petition, and I've cited them. There are also a decision which I think is also, I've also cited in my brief that says that when you accept an interlocutory appeal, you accept an interlocutorial, not over the order, but over the entire case. So I have an agreement with the plaintiffs to support them in pursuing the capitation fee. I have argued the capitation fee. If I brief the capitation fee, there's nothing to be done other than if you want the benefit of Judge Conte's opinion on the capitation fee to be added, but it will be right back here in five months. Either way. I do want to, yes, Judge? You go ahead with what you want to say and then I'll put a question to you. You go ahead. Okay. Mr. Lockman has talked about this windfall several times. Remember that the providers, somebody paid out that money to the providers, okay? And if we're not entitled to recover that money, then the MCO is entitled to recover that money. They shouldn't be able to pocket, recover medical bills and put it in their pocket. And my argument on the capitation fees essentially is that, he said we didn't kick back any money to the carrier? Absolutely we kicked back money to the carrier. Not on a case by case basis, but in the capitation fee structure. Okay. I do want to talk a little bit about the negative election because we didn't mention the negative election in the opening argument. Lou, do you want to ask your question before we get to that? May I put a question to you at this point? Okay. Mr. Massa, Justice Scalia has, I'm sorry, Mr. Manning. Justice Scalia has instructed us many times that the way to construe a statute is to read the words and nothing else. Now I'm an acolyte of Justice Scalia. Tell me how I'm to write an opinion which explains why the language no lien may be imposed meant, well, yes, lien can be imposed. Well, I mean, if I were going to write that opinion, I would first say, first of all, that no lien could be imposed against property of the individual. That this is a situation where the state is not, on contrary to Alborn, the state is imposing a lien only on the property that is assigned to it. And that although in Alborn the court noted that it's strange to require a lien on your own property, in this situation with the rights under Pennsylvania law that only rise to bear legal title, that it's a convenient method of telling the bar, the public, what the rights of a partial assignment are under federal law. That in essence, in Alborn they actually say that the lien is also called an assignment makes no difference. That the lien is also called an assignment makes no difference. Or did I make it reverse? That the assignment is actually, I have to go get that. But they made the equation there. And that's why I keep on coming back to a rose by any other name. The partial assignment. Does the use of the words assignment and lien throughout the entirety of the United States Code, are they interchangeable throughout its entirety? Or are they interchangeable only with respect to these statutes at issue here? Well, again, normally you don't have partial assignments. Partial assignments are very obscure. Now, we all know what a complete assignment is. That's a complete transfer of all right, title, and interest. But again, when I got into researching this partial assignment issue, and this unique line of cases that flows from the Mandeville case, where the Supreme Court said, in a partial assignment, because of the ancient rule on splitting causes of action, the partial assignor retains the right to sue. Subject, and then you got into then, well, what was the rights of the partial assignee? And in Mandeville, they said, well, the partial assignee doesn't have a lien unless they've consented, yada, yada, yada, yada. But further along, after that was an 1830 case, when you got into the 20th century, courts began to recognize that the partial assignee must have a lien, they called it an equitable lien, or they called it something else, to enforce the partial assignment. I do want to talk about the negative election before I leave, because in 2008, shortly before the Tristani decision came down, we reached an agreement with the Pennsylvania Association of Justice, formerly the Trial Lawyers, to restructure the- Well, well, well, well, you reached an agreement, you being the state, reached an agreement with whom? The Pennsylvania Association for Justice. They used to be called PATLA, the Pennsylvania Association. Well, who are they? What do they have to do with anything? Well, they're the represent, they are the, like the Pennsylvania Bar for Trial Lawyers. I mean, if you're looking for trial lawyer, the group, the organization that represents plaintiff's personal injury bar is the Pennsylvania Association for Justice. Okay, so it's the plaintiff's lawyers. Right, so we were over there at the legislature in the House of Representatives, and we negotiated this bill. And what Act 44 does is it makes Medicaid liens voluntary. And the deal that we, that is what you see codified in 1409 now, 62, is this. When a plaintiff brings a case, when Mr. Loughran brings a case, he has to make a decision. He is either going to recover the state's medical bills and be subject to a lien for the portion of the state's medical bills, or he's going to give us a negative election. And a negative election says, state, you're on your own, and exactly what Mr. Loughran says, we have to do, we have to do. We sue, okay? Now, that's a voluntary situation, and the question that, of course, the district court didn't address because these are pre-Act 44 cases, but we're talking about ongoing declaratory injunctive release, so it's very relevant, okay, is whether Act 44 changes the dynamic. I mean, if the whole seeing, subjecting yourself to a Medicaid lien is now completely voluntary, where's the violation of the anti-lien provision? I mean, if I lose this case, will I be prohibited into entering agreements with the plaintiff's bar to protect our claims? I mean, that's what's happening now. Is every plaintiff's lawyer bound by this thing, or it's now in a statute? It's now in a, there's a negative election procedure. We don't use the words negative election in the statute. We use it in the statement of policy, but it's this procedure where they could send us a notice, Chikanti discusses it in her opinion, where they send us a notice and say, We're going to sue. We're gonna sue, and we're not recovering your medical expenses. And basically, state, you're on your own. And the question I have for the court, because again, we're dealing with ongoing declaratory injunctive relief, is does this change everything? I mean, if the liens are now voluntary, does it make a difference whether or not it's a positive election or a negative election? I mean, I will tell you that since that statute came into force on September 5th or 8th, 2008, we've received like 10 negative elections. The plaintiff's personal injury bar doesn't want us in their cases. We muck it up, okay? It's another seat at the table. I mean, it's- But they want you at the table when they're gonna resolve it. We wanna be at the table when they're gonna resolve it so that we get our lien paid. Well, and they want you too, because if I have a client and I'm thinking about settling my case for 100,000, and I've gotta pay the state 80, I'm probably not gonna settle it. But if your designee sits at the table with me and says you'll take a haircut, and that you'll take 40, then maybe we can work it out. So it's important that you are at the table. And Schaefer-Doan, the Schaefer-Doan decision, which came down from Commonwealth Court decision, in the context of lien structure, says the state is guaranteed a seat at the settlement table under the lien structure without intervening. How do you decide how much of, I'm sorry. How do you decide how much of a settlement is for the medical part and how much is for all the others? Oh, we didn't get to argue that, but let me give you this. I'm very glad you asked that question. We have a default rule in Pennsylvania. It's called 50% of the net. But you can get a court allocation, and we have, in our statement of policy, said you could also get an administrative law judge to do an allocation. As a practical matter, I will tell you that I do all the Alborn allocations for the state. A lawyer comes to me, I say let me see your complaint, your pretrial statement, and just give me, don't give me the whole medical record, give me a couple of medical. I look at it and I say, gee, what do I think is the value of this case? They tell me as an absurd figure, usually an absurdly high figure. I say, eh, I don't think so. We won't reach a deal.  Isn't that a violation of the Supreme Court's decision in the sense that the state may be getting more than for the medical? Absolutely not. Absolutely not. Because they're consenting to what the medical portion is. The issue is this 50% of the net rule, this default rule, okay? And there you get to the end passage in Alborn, which the court, where it was just sort of like a throwaway, that when there was the complaint of, well, plaintiffs are gonna manipulate, et cetera, et cetera, the court says, well, we're not prohibiting the states from establishing rules. And I won that issue before Judge Conte. Judge Conte said that the 50% of the net rule as a default rule was fine. And I remind you that the default rule can always be challenged. If you're in common police court, you can ask for hearing before a judge. If you're not in court at all, you can ask for an administrative hearing before an administrative law judge, and either an administrative judge or a state court judge will decide the allocation. The default rule is simply what happens if nothing happens. And 50% of the net comes out to roughly 30% of the gross settlement. I don't know if anybody here on the bench has done personal injury rule, and you remember with the insurance adjuster's rule of thumb, but it comes pretty close to the insurance adjuster's rule of thumb on taking specials and figuring out generals three to five times generals. But I do want to come back to this, just to wrap up on this negative election thing, because what I was saying is, does the anti-lien provision prevent me from going to Mr. Loughran in a case and saying, Pat, you don't want me in your case because you don't want the jury to hear that your client is on welfare. How about we cut a deal that you'll protect the department's claim, and I won't show up in your case? That's what happens in most cases. It's not a lien. It's not illegal. It doesn't violate the no lien provision because it's not illegal. So what is illegal about the legislature enacting a statute that says, Patrick, when you decide to bring a case, you have these choices. You can send us a letter and say, state you're on your own, no lien, or you cannot send us a letter and say, okay, you recover our medicals and there's a lien. Is there really a distinction there? Thank you, Your Honor. That's the next case. Pardon? That's the next case. Well, it might be this case. Thank you. Thank you very much. Thank you, gentlemen. It was very well argued and we appreciate it. And all the briefs. Thanks. Thank you, Greg. This court stands adjourned until Monday, April 19th at 9 38.